THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
ANTONIO RIVERA, Appellant.

First Department, January 14, 1993

**APPEARANCES OF COUNSEL**

*Daniel Hsiung* of counsel, New York City *(Philip L. Weinstein,* attorney), for appellant.

*Richard Sheridan* of counsel, Bronx *(Susan L. Valle* with him on the brief; *Robert T. Johnson, District Attorney* of Bronx County, attorney), for respondent.

**OPINION OF THE COURT**

SULLIVAN, J. P.

Convicted, after a jury trial, of criminal possession of a controlled substance in the third degree, defendant challenges the sufficiency of proof, specifically citing the gap in the chain of custody between the arresting officer's initial possession of the drugs in question and subsequent vouchering of them at the station house when they were returned to him. The facts are basically uncontroverted.

On November 24, 1990, at about 11:30 A.M., Detectives Alfred, Sosa and Sanchez of the Bronx Tactical Narcotics Unit, under the supervision of Sergeant Orlando and supported by a field team of 10 other police officers, proceeded, in plain clothes, to the vicinity of 182nd Street and Creston Avenue in the Bronx to participate in an "observation" buy operation. Walking ahead of the other two detectives, who followed on opposite sides of the street, Detective Alfred observed, across the street in front of a bodega at 2239 Creston Avenue, a group of four or five individuals, including defendant and another, who was later arrested with defendant and identified as Angel Pantoia. Alfred saw two different persons walk up to defendant, whom he described as bearded, with a mustache and wearing a white hat and shirt, gray jacket and blue jeans, and touch hands with him.

Detective Alfred crossed the street and, as he walked towards the bodega, heard defendant call out, "White Eagle", which the detective, who, in an undercover role, had participated in approximately 300 to 350 buy and bust operations, knew to be a brand name for heroin. Pantoia then asked Alfred, "[H]ow many?", and the detective responded, "[T]wo." Holding a single glassine envelope in his hand, Pantoia said, "Here, buy my last one." After the two engaged in further

conversation about heroin, Pantoia pointed to defendant, who, after Alfred approached him, asked how many he wanted. Alfred replied, "Give me two." Defendant reached into his pocket, pulled out several glassine envelopes and placed two of them in the detective's hand. Detective Alfred then made a motion as if he were reaching into his pocket, which was the prearranged signal for the back-up team to move in.

Detective Sosa, who had moved to within two or three feet of Detective Alfred, saw defendant hand the undercover officer glassine envelopes, while Detective Sanchez, who was four or five car lengths away on the same side of the street, observed Alfred give the arrest signal and radioed the field team to move in. As the back-up team responded, Detective Alfred grabbed defendant and informed him that he was under arrest. Detective Alfred subsequently recovered from defendant $56 and four additional glassine envelopes, each of which, as well as the original two envelopes handed to him by defendant, bore the emblem "White Eagle". Three other persons were arrested at the same time for narcotics violations. Detective Alfred handed the six glassine envelopes to Sergeant Orlando, who had arrived at the arrest scene with the field team.

According to the undercover officer, there were no differences between the two glassine envelopes he had purchased from defendant and the four he subsequently recovered from him at the time of arrest. Detective Alfred did not mark any of the six envelopes before handing them to Orlando, who remained in possession of the glassine envelopes for about 30 to 45 minutes before returning them to Detective Alfred at the precinct. Orlando did not testify as to what he did with the envelopes in the interim. In vouchering the glassine envelopes, Alfred initialled each of them and sealed them in a manila envelope, which he forwarded to the police laboratory for analysis. At trial, solely on the basis of his initials, he identified, as those he "recovered", the six glassine envelopes, which were shown to contain four grams of heroin. He never testified that they were the envelopes given by or taken from defendant.

Although the trial court noted the gap in the chain of custody and, at its urging, defendant placed an objection in the record, the People never recalled Sergeant Orlando as a witness. Since the People failed to present an unbroken chain of custody with respect to the six glassine envelopes of heroin or reasonable assurances that, prior to being vouchered, the

envelopes were kept separate from those recovered from others arrested earlier that day or at the same time, the evidence was insufficient to prove defendant's possession of a narcotic drug. *(See, Matter of Lewis v New York State Racing & Wagering Bd.,* — AD2d — [1st Dept, Jan. 14, 1993].) Accordingly, we reverse and dismiss the indictment.

When the People seek to introduce in evidence an object associated with a crime they "must establish, first, that the evidence is identical to that involved in the crime; and second, that it has not been tampered with." *(People v Julian,* 41 NY2d 340, 342-343.) Proof of an unbroken chain of custody is generally the method of showing the accuracy and authenticity of a fungible item of evidence *(see, People v Connelly,* 35 NY2d 171, 174), but "failure to establish a chain of custody may be excused 'where the circumstances provide reasonable assurances of the identity and unchanged condition' of the evidence." *(People v Julian,* 41 NY2d, *supra,* at 343, quoting *Amaro v City of New York,* 40 NY2d 30, 35.) Where there are reasonable assurances of the identity and unchanged condition of the evidence, deficiencies in the chain of custody go to the weight of the evidence and not to its admissibility. *(People v White,* 40 NY2d 797, 799-800.) Where the circumstances fail to provide such assurances, however, a gap in the chain of custody affects the admissibility of the evidence, not just its weight. *(See, e.g., People v Ramos,* 147 AD2d 718, *lv denied* 74 NY2d 817.)

In the instant matter, given the fungible nature of the evidence, i.e., glassine envelopes marked "White Eagle", the People failed to present a continuous chain of custody. Although called as a witness, Sergeant Orlando never testified as to his custody of the six glassine envelopes. Even after the court noted the gap in the chain of custody,* the prosecutor never sought to recall Orlando. It is entirely possible that other police officers also seized drugs at the scene and handed them over to Orlando and that Orlando commingled the envelopes before sorting them out at the precinct. In this regard, it should be noted, three other individuals, including Pantoia, who offered Alfred a single envelope, presumably the same brand, after defendant called out, "White Eagle", were also arrested at the scene for drug possession. Thus, there is a gap in the chain of custody of the drugs for a thirty-to-forty-

---

* In so doing, the court expressed the view that the chain of custody deficiency affected the weight of the evidence, not its admissibility.

five-minute period while Orlando, in an undoubtedly hectic atmosphere, was processing these arrests. Alfred's testimony did not close the gap in the chain of custody. He was only able to identify the drugs introduced at trial as the drugs he initialled, not as the drugs he obtained or recovered from defendant. Since Alfred testified that he never initialled any envelopes until Orlando returned six glassine envelopes to him, his identification of the envelopes on the basis of those initials was clearly deficient.

Without Orlando's testimony as to his custody of the drugs handed to him by Alfred or any of the other officers at the scene, it cannot be determined if he properly segregated the drugs in question. Thus, there was a deficiency in the proof that they were, indeed, given by, or recovered from, defendant. In this regard, the jury could only speculate that the six glassine envelopes in evidence were those that defendant had possessed. *(See, e.g., People v Miller,* 174 AD2d 901.) Given this insufficiency of proof, the indictment must be dismissed.

In light of this determination, we need not reach defendant's other contentions.

Accordingly, the judgment of the Supreme Court, Bronx County (Irene Duffy, J.), rendered July 17, 1991, convicting defendant, after a jury trial, of criminal possession of a controlled substance in the third degree and sentencing him, as a predicate felony offender, to an indeterminate term of four and one-half to nine years, should be reversed, on the law, and the indictment dismissed. The matter is remitted to the trial court for the purpose of entering an order in favor of the accused pursuant to CPL 160.50, not less than 30 days after service of this order upon the respondent, with leave during this 30-day period to respondent to move and seek any further stay of the implementation of CPL 160.50 as in the interest of justice is required.

Milonas, Kupferman and Ross, JJ., concur.

Judgment of the Supreme Court, Bronx County, rendered July 17, 1991, convicting defendant, after a jury trial, of criminal possession of a controlled substance in the third degree and sentencing him, as a predicate felony offender, to an indeterminate term of four and one-half to nine years, is reversed, on the law, and the indictment dismissed. The matter is remitted to the trial court for the purpose of

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

entering an order in favor of the accused pursuant to CPL 160.50, not less than 30 days after service of this order upon the respondent, with leave during this 30-day period to respondent to move and seek any further stay of the implementation of CPL 160.50 as in the interest of justice is required.